IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | |
|---|---|
| SUSAN DEWBERRY, CAROLE HOLCOMBE, SUZANNE DANIELSON, ARNOLD BUCHMAN, DON HEATH, and DALE SCHAFFNER, | Civ. No. 04-6175-AA |
| | OPINION AND ORDER |
| Plaintiffs, | |
| v. | |
| THE HONORABLE THEODORE R. KULONGOSKI, Governor of the STATE OF OREGON, Other Executive OFFICERS in the STATE OF OREGON, and the CONFEDERATED TRIBES OF COOS, UMPQUA, and SIUSLAW INDIANS, | |
| Defendants. | |

_____

Kelly W.G. Clark
Kristian Roggendorf
O'Donnell & Clark LLP
Fremont Place II, Suite 302
1650 N.W. Naito Parkway
Portland, OR 97209
     Attorneys for plaintiffs

1 - OPINION AND ORDER

Hardy Myers
Attorney General
Katherine G. Georges
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301
    Attorneys for State of Oregon defendants

Patricia L. Davis
1245 Fulton Avenue
Coos Bay, Oregon 97420

Bruce R. Greene
Alice E. Walker
Greene, Meyer & McElroy
1007 Pearl Street, Suite 220
Boulder, CO 80302
    Attorneys for Confederated Tribes of Coos, Lower Umpqua, and
    Siuslaw Indians

Craig Dorsay
2121 S.W. Broadway, Suite 100
Portland, OR  97201
    Attorney for amicus Tribes

AIKEN, Judge:

    Plaintiffs filed suit against Governor Kulongoski, other State of Oregon executives (State defendants or the State), and the Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians (the Tribes), seeking a declaration that a gaming compact (the Compact) between the State and the Tribes is "unconstitutional, illegal, null and void."  Complaint, ¶ 22. Plaintiffs allege that the Compact violates the prohibition against the establishment of casinos contained in the Oregon Constitution and was not lawfully executed by the Governor and thus permits unlawful gaming under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721.

On November 1, 2005, the court heard oral argument on the parties' motions for summary judgment and plaintiffs' motion for order to certify questions to the Oregon Supreme Court. Upon consideration of the arguments raised in the briefing and at oral argument, State defendants' and the Tribes' motions are granted, and plaintiffs' motions are denied.

BACKGROUND FACTS

This litigation is the latest in a string of lawsuits challenging the Tribes' right to conduct class III gaming activities on the Hatch Tract pursuant to their Compact with the State. While the facts leading up to this lawsuit have been repeated numerous times, they are recited again here, as the court's opinion is dispositive.

The Tribes are a federally recognized Indian tribe headquartered in Coos Bay, Oregon. In 1998, a parcel of land located in Florence, Oregon known as the Hatch Tract was acquired in trust by the Secretary of the Interior (Secretary) for the benefit of the Tribes. The Tribes sought to establish a gaming facility and petitioned the Secretary to exempt the Hatch Tract from the prohibition against gaming on Indian lands acquired after the enactment of IGRA 1988. 25 U.S.C. § 2719(a). The Tribes argued, *inter alia*, that the Hatch Tract met the "restored lands" exception under IGRA, and that the gaming prohibition on after-acquired lands did not apply. Id. § 2719(b)(1)(B)(iii).

The Secretary denied the Tribes' request to exempt the Hatch Act, and the Tribes filed suit in the United States District Court for the District of Columbia. The district court ultimately concluded that the Secretary had failed to consider all relevant facts when determining that the Hatch Tract did not qualify as restored lands under IGRA. See Confederated Tribes of Coos v. Babbitt, 116 F. Supp. 2d 155, 164 (D.D.C. 2000).

Upon remand, the Secretary reversed her previous determination and concluded that the Hatch Tract qualified as restored lands under IGRA. In 2002, the State of Oregon filed suit in this court challenging the Secretary's revised determination and took the position that the Hatch Tract was not eligible as a gaming site under the restored lands exception.

While litigation ensued, the Tribes and John Kitzhaber (then the Governor of Oregon) negotiated a gaming compact to govern gaming on the Hatch Tract if this court determined that the restored lands exception applied.

On January 8, 2003, the Compact was signed by the parties. On the same day, the Tribes passed a resolution authorizing the Compact. Games permitted under the Compact include blackjack, pai-gow poker, Caribbean stud poker, let-it-ride, mini-baccarat, big 6 wheel, keno, craps, roulette, pari-mutuel wagering, and video lottery games of chance.

On March 7, 2003, the Secretary approved the Tribes' Compact.

On July 1, 2003, this court issued a decision affirming the Secretary's determination that the Hatch Tract was restored lands within the meaning of IGRA and therefore eligible as a gaming site. See Oregon v. Norton, 271 F. Supp. 2d 1270 (D. Or. 2003). The State did not appeal, and the Tribes proceeded with plans to develop a gaming facility on the Hatch Tract.

On September 15, 2003, plaintiffs sought a writ of mandamus from the Oregon Supreme Court to enjoin further development of the Hatch Tract for gaming purposes. On November 28, 2003, the Oregon Supreme Court denied the petition without comment, and plaintiffs subsequently filed a second petition for writ of mandamus in Lane County Circuit Court. The state court dismissed the petition, finding that plaintiffs could obtain adequate relief in the form of a declaratory judgment, and that the Tribes were necessary parties in any action challenging the Compact.

On January 5, 2004, the Tribes' Gaming Ordinance 30B was approved by the Chairman of the National Indian Gaming Commission.

On March 9, 2004, plaintiffs filed this action in Lane County Circuit Court. Plaintiffs claim that the Compact is invalid because it authorizes casino-style gaming prohibited by the Oregon Constitution, and that Governor Kulongoski, as successor to Governor Kitzhaber, had no authority to enter into the Compact and contravened the separation of powers provisions of the Oregon Constitution in doing so.

On April 7, 2004, the Tribes moved to dismiss plaintiffs'
claims on grounds of tribal sovereign immunity.  On May 7, 2004,
plaintiffs responded to the Tribes' motion and argued that the
Tribes had waived their sovereign status under IGRA.  Upon
plaintiffs' invocation of IGRA, State defendants removed this
action to federal court.[1]

In June 2004, the Tribes opened the Three Rivers Casino on a
portion of the Hatch Tract.  Currently, it is housed in a temporary
facility; the Tribes plan to build permanent structures, including
a larger gaming facility, a restaurant, motel, and shops.

<u>INDIAN GAMING REGULATORY ACT</u>

Although plaintiffs couch their claims in terms of a
declaratory action under state law, at its core, this lawsuit
challenges the validity of the Tribes' Compact under the provisions
of IGRA.  The crux of plaintiffs' argument is that if the Compact
either authorizes gaming that is prohibited by state law or was not
validly executed, the Compact permits unlawful class III gaming in
violation of IGRA.

Any discussion involving IGRA begins with the decision of the
United States Supreme Court in <u>California v. Cabazon Band of</u>

_____

[1]Plaintiffs sought remand to state court, arguing that they
raised no issue of federal law by seeking declaratory relief
pursuant to Or. Rev. Stat. § 28.020.  However, plaintiffs'
assertion of IGRA in response to the Tribes' motion to dismiss
raised a federal question under 28 U.S.C. § 1331, and plaintiffs'
motion for remand was denied.

Mission Indians, 480 U.S. 202 (1987).  In Cabazon, the Supreme

Court held that states had no authority to regulate gambling on

Indian lands.  Specifically, the Court ruled that Indian tribes are

entitled to license and operate gaming facilities on Indian land

without state regulation, if such tribes are located in states that

regulate rather than prohibit gaming, even if such gaming is highly

regulated.  Id. at 221-22.

> [I]f the intent of a state law is generally to prohibit
> certain conduct, it falls within [the state's] criminal
> jurisdiction, but if the state law generally permits the
> conduct at issue, subject to regulation, it must be
> classified as civil/regulatory. . . .  The shorthand test
> is whether the conduct at issue violates the State's
> public policy.

Id. at 209.  Underlying the Court's ruling is the long-standing

principal that a state has no jurisdiction over Indian lands unless

Congress has expressly ceded that jurisdiction.  Id. at 207.

In response to Cabazon, the following year Congress passed

IGRA to establish a comprehensive statutory scheme that governs

gaming on Indian lands.  25 U.S.C. §§ 2701-2721.  Through its

gaming classification requirements, IGRA gives back to the states

"some of the regulatory authority that the Supreme Court had held

inapplicable to Indian lands in Cabazon."  Artichoke Joe's

California Grand Casino v. Norton, 353 F.3d 712, 721 (9th Cir.

2003); see also 25 U.S.C. § 2710(b),(d).

IGRA classifies gaming activities into three categories,

class I, class II and class III, with each subject to a different

level of regulation. 25 U.S.C. § 2710. Class I games are not subject to any type of regulation and include traditional forms of Indian gaming or social games for prizes of minimal value. <u>Id.</u> §§ 2703(6), 2710(a)(1).

Class II games include bingo and other similar games, pull-tabs, lotto, punch boards, tip jars, and certain card games. <u>Id.</u> § 2703(7). Class II games are authorized if conducted under an approved gaming ordinance adopted by the tribe and located in a state that permits class II gaming for any purpose by any entity. <u>Id.</u> § 2710(a)(2),(b)(1)(A) and (B).

Class III gaming is the "most heavily regulated and most controversial form of gambling" under IGRA and includes forms of gaming that are not class I or II, such as slot machines, roulette, craps, and house-banked card games. <u>Artichoke Joe's</u>, 353 F.3d at 715; 25 U.S.C. § 2703(8). In addition to the requirements that such gaming be authorized by the Indian tribe and the National Indian Gaming Commission and located in a state that permits such gaming, class III gaming must conform to a Tribal-State compact entered negotiated by the Indian tribe and the state. 25 U.S.C. § 2710(d)(1).

Thus, if a tribe wishes to conduct class III gaming, generally it must negotiate a compact with the state that establishes the scope and regulation of such activities. <u>Rumsey Indian Rancheria of Wintun Indians v. Wilson</u>, 64 F.3d 1250, 1255 (9th Cir. 1994).

Compacts may include provisions regarding: 1) the application of tribal or state gaming laws; 2) the allocation of state and tribal jurisdiction; 3) assessments to the state to defray the costs of regulating tribal gaming; 4) taxation by the tribe comparable to state taxation; 5) remedies for breach of the compact; 6) standards for the operation and maintenance of tribal gaming facilities; and 7) other provisions related to gaming. 25 U.S.C. § 2710(d)(3)(C).

Notably, states must negotiate with tribes for class III gaming if the state permits such gaming activities "for any purpose by any person, organization, or entity." Id. §§ 2710(d)(1)(B), 2710(d)(3)(A). Finally, the Secretary must independently approve the compact to become effective. Id. § 2710(d)(1)(C),(d)(3)(B). The compacting process thus provides a "means of sharing with the states the federal government's regulatory authority over class III gaming." Artichoke Joe's, 353 F.3d at 722.

With respect to other gaming activities, "IGRA makes it a federal crime to violate state gambling law in Indian country unless authorized by a compact." United States v. Spokane Tribe of Indians, 139 F.3d 1297, 1299 (9th Cir. 1998); 18 U.S.C. § 1166(a) ("[A]ll State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.").

> The State, however, has no jurisdiction over gaming
> activities that are not the subject of a Tribal-State
> compact.  IGRA limits the state's regulatory authority to
> that expressly agreed upon in a compact.  Outside the
> express provisions of a compact, the enforcement of
> IGRA's prohibitions on class III gaming remains the
> exclusive province of the federal government.

Cabazon Band of Mission Indians v. Wilson, 124 F.3d 1050, 1059 (9th

Cir. 1997).  The federal government thus retains "the power to

prosecute violations of state gambling laws in Indian country, so

as to preserve the delicate balance of power between the States and

the tribes."  Artichoke Joe's, 353 F.3d at 722; see also Sycuan

Band of Mission Indians v. Roache, 54 F.3d 535, 539-40 (9th Cir.

1994).

DISCUSSION

State defendants move for summary judgment on four grounds:

1) plaintiffs lack standing to sue; 2) plaintiffs have no private

right of action to enforce IGRA; 3) the Tribes are a necessary and

indispensable party with sovereign immunity to suit; and 4) the

Compact between the State and the Tribes does not violate IGRA or

Oregon law.  The Tribes move for summary judgment on grounds of

sovereign immunity, although in the alternative the Tribes adopt

the arguments of the State defendants.

Plaintiffs, in turn, move for summary judgment on grounds that

the Oregon Constitution prohibits the establishment of casinos and

that the Governor exceeded his authority in negotiating and

executing the Compact with the Tribes.

Although I find standing and indispensability of the Tribes dispositive, I agree with State defendants that the interests of judicial economy support the discussion and resolution of all stated grounds for relief to avoid the necessity of remand after appeal.

A.  Standing

State defendants argue that plaintiffs have no standing to bring this action, because their alleged harm resulting from the Tribes' casino constitute generalized grievances borne by the public at large rather than concrete and particularized injuries suffered personally by plaintiffs.

Standing is an essential component of the case or controversy requirement of Article III, section 2 of the United States Constitution.  "The standing doctrine, like other Article III doctrines concerning justiciability, ensures that a plaintiff's claims arise in a 'concrete factual context' appropriate to judicial resolution."  Arakaki v. Lingle, 423 F.3d 954, 965 (9th Cir. 2005); see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1981) (the standing requirement "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action").  The Supreme Court has articulated the following

"irreducible constitutional minimum" for standing: 1) the plaintiff must have suffered an "injury in fact," which is "concrete and particularized" and actual or imminent, not conjectural or hypothetical; 2) the injury must be caused by the defendant; and 3) it must be "likely," rather than "speculative," that the injury will be redressable by the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

In addition to these constitutional requirements, "the prudential doctrine of standing has come to encompass several judicially self-imposed limits on the exercise of federal jurisdiction." United Food & Comm. Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996) (internal citation and quotation marks omitted). "Together, the constitutional and prudential components of standing ensure that plaintiffs possess 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" Oregon Advocacy Ctr. v. Mink, 322 F.3d 1101, 1109 (9th Cir. 2003) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). Among prudential limitations is the "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." Allen v. Wright, 468 U.S. 737, 751 (1984).

Plaintiffs here allege that they will be harmed by the Tribes'

casino through higher taxes, reduced property values, increased traffic congestion on surrounding streets and Highway 126, increased air, noise and light pollution, and the detrimental effect on local businesses. <u>See generally</u> Affidavits of Don Heath, Carole Holcombe, Susan Dewberry, Suzanne Danielson, Arnold Buchman, and Dale Schaffner. However, none of these alleged injuries are sufficiently concrete or particularized to meet the constitutional requirement of injury in fact or the prudential limitation against adjudication of generalized grievances.

To be particularized, "the injury must affect the plaintiff in a personal and individual way." <u>Lujan</u>, 504 U.S. at 560 n.1. Even assuming the direct threat of injury, higher taxes, increased traffic and pollution, and decreased property values would befall all citizens of Florence as well as others who travel on Highway 126. Such injuries are simply not "personal" to plaintiffs. Thus, plaintiffs allege nothing more than generalized grievances shared by the public at large that the Supreme Court has repeatedly refused to recognize as sufficient to confer standing. <u>United States v. Hays</u>, 515 U.S. 737, 743 (1995); <u>Valley Forge</u>, 454 U.S. at 473 ("Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of 'standing' would be quite unnecessary."). To the extent that plaintiffs claimed harm is the Governor's allegedly unlawful exercise of authority, "[t]his

Court repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law." Valley Forge, 454 U.S. at 482-83 (internal citations and quotation marks omitted); see also Baird v. Norton, 266 F.3d 408, 411 (6th Cir. 2001).

At oral argument, plaintiffs all but conceded that the alleged injuries of four plaintiffs could be construed as generalized grievances. However, plaintiffs argue that Suzanne Danielson and Dale Schaffer allege concrete and particularized harm, because Danielson lives next to Highway 126 and Schaffner lives adjacent to the Hatch Tract. I disagree.

Danielson alleges that the increased traffic on Highway 126 will expose her family to greater risks traveling on an already-dangerous stretch of public highway, and Schaffner alleges that the property values in his neighborhood will decline due to the Tribes' casino. Affidavit of Suzanne Danielson, pp. 1-3; Affidavit of Dale Schaffner, p. 2. However, Danielson and Schaffner fail to demonstrate how these alleged injuries will cause them harm different from the type which may be suffered by the community at large or other frequent travelers of Highway 126.

I find the case of Willis v. Fordice, 850 F. Supp. 523 (D. Miss. 1994), aff'd, 55 F.3d 633 (5th Cir. 1995), to be particularly instructive. There, a member of the Mississippi Band of Choctaw Indians brought suit challenging a state-tribal gaming compact.

The plaintiff alleged that he would be "specially, detrimentally and adversely affected by the presence of a casino within the boundaries of his traditional tribal homeland, to-wit":

> said casino will cause material and irreparable damages
> by permanently altering Mr. Willis' immediate community
> in a manner hostile to his traditional and religious
> beliefs. Mr. Willis also owns an Indian novelty shop,
> [and] the Casino will bring other businesses into the
> area of Mr. Willis' business and adversely affect the
> same. The crime increases in the area will also threaten
> Mr. Willis' business which is located on the Choctaw
> reservation . . . where the Casino will be constructed.

Id. at 528. The district court found that the plaintiff allegations of harm failed to "assert[] facts which support the first element for standing, that he has suffered an injury in fact." Id. The court explained:

> [Willis] has not alleged that the harm he could suffer is
> any different in kind from the harm which might befall
> other Choctaws on the reservation or other residents in
> the Philadelphia community. Such concerns are more a
> matter for political resolution rather than judicial
> interference. . . . Because Willis has not alleged that
> he will suffer harm which is different from the type of
> harm which may be suffered by other Choctaws or the
> community at large, he has no standing to pursue this
> action.

Id. at 528-29; see also Sears v. Hull, 961 P.2d 1013, 1017-18 (Ariz. 1998) (finding allegations of harm that proposed gaming facility would expose plaintiffs' children to "conduct contrary to the[ir] values," "result in urban crowding, traffic and stresses," and cause "economic loss" to surrounding homes and businesses, "alleged only generalized harm rather than any distinct and palpable injury").

I find the allegations asserted by Schaffner and Danielson are generalized grievances similar to those alleged in <u>Willis</u> and <u>Sears</u> and do not allege the type of concrete, particularized harm sufficient to meet standing requirements.

Furthermore, even if plaintiffs' injuries could be considered concrete and particularized, they are not actual or imminent. For example, Schaffer presents no evidence to support the imminence of declining property values in his neighborhood. In fact, Schaffner states that a similar house in his neighborhood was recently listed for sale at a price $35,000 higher than the purchase price of his home three years ago. Although Schaffner opines that he does "not believe [this house] will be sold for anything near the asking price," he offers no evidence to support his belief. Affidavit of Dale Schaffner, p. 2. Likewise, Danielson cites no persuasive evidence that increased traffic is imminent or will result in more hazardous conditions for her family. Indeed, no plaintiff presents evidence to suggests that the threat of higher taxes, reduced property values or increased pollution is either actual or imminent.

Plaintiffs rely on <u>Wilbur v. Locke</u>, 423 F.3d 1101 (9th Cir. 2005) to argue that in a declaratory action, plaintiffs need not "await the consummation of threatened injury" prior to filing suit." <u>Id.</u> at 1108. While <u>Wilbur</u> recognizes that a threat of injury may comply with the injury-in-fact requirement, it is well-

established that the threat must be "both real and immediate, not conjectural or hypothetical." Scott v. Pasadena Unified School Dist., 306 F.3d 646, 656 (9th Cir. 2002) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 (1983)); see also id.

Significantly, at issue in Wilbur was a compact governing taxes of cigarette sales by Indian retailers. Wilbur, 423 F.3d at 1104. Individual tribal members filed suit to declare applicable Washington statutes unconstitutional and to enjoin enforcement of the impending compact between the state and the Swinomish Indian Tribe. Id. at 1105. Even though the compact had not been executed at the time the plaintiffs filed suit, the Ninth Circuit found that they had standing to challenge the compact, because the "regulations contemplated by the proposed compact would cause the Wilburs cognizable economic injury by forcing them to incur additional costs." Id. at 1107.

In other words, the harm resulting from enforcement of the compact in Wilbur was imminent and certain to occur. In contrast, plaintiffs here present no evidence that the threat of injury is immediate. Instead, plaintiffs rely on their "beliefs" that these harms will occur after the completion of the Tribes' casino. I find such beliefs conjectural and insufficient to establish a threat of concrete and particularized harm that is actual or imminent.

Accordingly, plaintiffs fail to demonstrate a "personal stake"

in this litigation sufficient to satisfy the requirement of "injury in fact," and plaintiffs lack standing to pursue this action.

B.  Tribal Sovereign Immunity

The Tribes move for summary judgment on grounds of sovereign immunity.  The Tribes argue that they are immune from suit and have not consented to suit or otherwise waived their immunity.

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers."  Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978).  Therefore, legal action against an Indian tribe is precluded unless the tribe waives its immunity or Congress expressly abrogates tribal immunity by authorizing suit against a tribe.  See Kiowa Tribe v. Manufacturing Techs., Inc., 523 U.S. 751, 754, 760 (1998); Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509 (1991).  Plaintiffs argue that Congress has waived or abrogated the Tribes' sovereign immunity to suit under IGRA, because their Compact permits unlawful class III gaming activities in violation of IGRA.  At the same time, plaintiffs maintain that they seek relief under state law rather than IGRA.  In other words, plaintiffs would have the court deem the Tribes' sovereign immunity abrogated with respect to any claim associated with the Compact, simply because the Tribes invoked their rights under IGRA by negotiating a gaming compact with the State.

To be sure, Congress abrogated tribal immunity to a limited

extent by authorizing a *state* to sue a tribe "to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." 25 U.S.C. § 2710(d)(7)(A)(ii). Thus, the State of Oregon could file suit to enjoin gaming not permitted under the Tribes' Compact. Further, as the authority to enforce state gambling laws lies solely with the federal government, the federal government could bring an action to enforce state gambling laws with respect to non-compacted gaming. See 18 U.S.C. § 1166; 25 U.S.C. § 2710(d)(7)(A)(iii).

However, no private cause of action exists to enforce a gaming compact under IGRA. See Hein v. Capitan Grande Band of Diegueno Mission Indians, 201 F.3d 1256, 1260 (9th Cir. 2000) (finding no general private right of action to enforce IGRA). Thus, the limited abrogation of sovereign immunity does not extend to any claim brought by any person in connection with the Tribes' Compact, and plaintiffs cannot invoke IGRA to overcome the Tribes' sovereign immunity. See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist., 276 F.3d 1150, 1159 (9th Cir. 2002) ("Federally recognized Indian tribes enjoy sovereign immunity from suit, and may not be sued absent an express and unequivocal waiver of immunity by the tribe or abrogation of tribal immunity by Congress.") (internal citation omitted).

Thus, the Tribes' sovereign immunity has not been abrogated or waived, and plaintiffs' claims against them must be dismissed.

C. Indispensable Party

The State defendants and the Tribes next argue that if the Tribes are entitled to sovereign immunity, plaintiffs' action must be dismissed pursuant to Rule 12(b)(7), because the Tribes are a necessary and indispensable party that must be joined under Rule 19(b). Plaintiffs respond that the Tribes are neither necessary nor indispensable, and that this action may proceed even if their claims against the Tribes are dismissed.

Notably, in dismissing the petition for writ of mandamus, the state court ruled that the Tribes were a necessary party to an action challenging the validity of the Compact. Order Granting Motion to Dismiss Writ of Mandamus, p. 4, <u>Dewberry v. Kulongoski</u>, No. 16-03-23044 (Lane County cir. Ct. Jan. 23, 2004). Likewise, in denying the plaintiffs' motion for remand, this court reasoned that "it is disingenuous for plaintiffs to argue that the relief sought by them will not affect the Tribes when plaintiffs seek a declaration that the Tribes' compact - and its authority to conduct Class III gaming - is unconstitutional." Opinion and Order dated November 17, 2004, pp. 9-10.

Nonetheless, given that this issue has now been placed squarely before the court, I address it here.

Whether a party is indispensable to an action involves "three successive inquiries." <u>E.E.O.C. v. Peabody W. Coal Co.</u>, 400 F.3d 774, 779 (9th Cir. 2005). First, the court determines whether the

absent party is "necessary," i.e., whether "in the person's absence complete relief cannot be accorded among those already parties," or whether "the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect that interest. . . ." Fed. R. Civ. P. 19(a)(1) and (a)(2)(i). Second, the court determines the feasibility of joinder (or in this case, retention of the Tribes as a party defendant). Fed. R. Civ. P. 19(a). Finally, if the absent party is necessary and cannot be joined, "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed. R. Civ. P. 19(b).

Plaintiffs argue that the Tribes' interests are not affected in this case, because plaintiffs seek only a declaration that Oregon law prohibits the gaming activities authorized under the Compact and that the Governor has no authority to execute gaming compact. Plaintiffs emphasize that they seek no relief from the Tribes, and proceeding in their absence thus will not impair or impede their ability to protect their interests.

I find plaintiffs' argument foreclosed by the Ninth Circuit's ruling in American Greyhound Racing, Inc. v. Hull, 305 F.3d 1015 (9th Cir. 2002). There, racetrack owners and operators brought

suit against the governor of Arizona "to challenge the legality of the Governor's actions in negotiating new gaming compacts with Indian tribes, or in extending the tribes' existing compacts." 305 F.3d at 1018. The district court found that the Indian tribes were not necessary parties, because the tribes had no legally protected interest in gaming that was not permitted by state law and complete relief could be afforded in the tribes' absence. American Greyhound Racing, Inc. v. Hull, 146 F. Supp. 2d 1012, 1043-49 (D. Ariz. 2001).

The Ninth Circuit reversed, finding that "the tribes claim an interest [in their compacts] and are so situated that this litigation *as a practical matter* impairs or impedes their ability to protect it." American Greyhound, 305 F.3d at 1023 (emphasis in original). Specifically, the Ninth Circuit rejected the district court's finding that the tribes had no interest in gaming prohibited by state law, because "[i]t is the party's *claim* of a protectible interest that makes its presence necessary." Id. at 1024 (emphasis in original).

In this litigation, plaintiffs not only challenge the authority of the Governor and the validity of tribal casinos in Oregon, plaintiffs explicitly seek a declaration that the Tribes' Compact is unconstitutional, illegal, and void.[2] Transcript of

---

[2]Even if plaintiffs' request was so limited, this court finds that the Tribes' interests in the validity of the Compact would render them necessary parties.

Proceedings, November 1, 2005 (Transcript), p. 27 (reiterating plaintiffs' request that the court "invalidate this Compact."). Thus, the Tribes have legally protected interests in this action that "arise from terms in bargained contracts," and disposition in this matter in the Tribes' absence would impede if not impair the Tribes' ability to protect their claimed interests negotiated under the Compact. <u>American Greyhound</u>, 305 F.3d at 1023. Consequently, whether the Oregon Constitution prohibits the gaming activities permitted by the Compact and whether the Governor had authority to enter into the Compact are matters on which the Tribes are "entitled to be heard." <u>Id.</u> at 1024; <u>see also</u> <u>Kescoli v. Babbitt</u>, 101 F.3d 1304, 1310 (9th Cir. 1996).

Plaintiffs next argue that the Tribes are not necessary parties, because the State can adequately represent their interests. <u>See</u> <u>Washington v. Daley</u>, 173 F.3d 1158, 1167 (9th Cir. 1999) ("As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit"). However, the Ninth Circuit rejected this argument in <u>American Greyhound</u>, reasoning that "the State and the tribes have often been adversaries in disputes over gaming, and the State owes no trust duty to the tribes" and their "interests under the compacts are potentially adverse." <u>Id.</u> at 1023 n.5.

Similarly, the State here originally challenged the

classification of the Hatch Tract as restored lands to prevent the
Tribes from establishing a gaming facility there.  As counsel for
the Tribes aptly noted at oral argument, the fact that the Tribes
and the State of Oregon have developed a good working relationship
and happen to be on the same side of the "v" in this litigation
does not mean that the State can adequately represent the Tribes'
interests under the Compact.  Indeed, under plaintiffs' reasoning:

> one seeking to nullify an agreement could simply sue one
> of the signatories and then argue that the remaining
> signatories were not necessary because the existing
> defendant would "adequately represent" their interest in
> defending the contract.  However, the general rule is
> exactly the opposite: all parties to a contract are
> necessary in litigation seeking to "decimate" that
> contract.

Wilbur, 423 F.3d at 1113-14.  I find that the reasoning in American
Greyhound and Wilbur applies with equal force in this case.
Therefore, I find that the Tribes are a necessary party pursuant to
Rule 19(a).

The second question is whether joinder is feasible.  It is
not.  As explained above, the Tribes are immune from suit, and they
have not consented to be sued.  See Kiowa Tribe, 523 U.S. at 754;
Dawavendewa, 276 F.3d at 1159.

The third and final question is "whether in equity and good
conscience the action should proceed among the parties before it,
or should be dismissed."  Fed. R. Civ. P. 19(b).  In determining
whether a party is indispensable, i.e., whether an action should be
dismissed in the absence of a necessary party, the court must

consider: 1) prejudice to the parties, including the absent party; 2) whether relief could be tailored to lessen the prejudice; 3) whether an adequate remedy can be awarded without the absent party; and 4) whether there exists an alternative forum. Kescoli, 101 F.3d at 1310-11.

"[T]he first factor of prejudice, insofar as it focuses on the absent party, largely duplicates the consideration that made a party necessary under Rule 19(a): a protectible interest that will be impaired or impeded by the party's absence." American Greyhound, 305 F.3d at 1024-25. Here, as discussed above, if the Compact is invalidated in the Tribe's absence, the Tribes' "protectible interests" in the Compact would be irrevocably impaired. Id. at 1025. Thus, the first factor favors dismissal.

As to the second factor, I find that it is not possible to lessen or avoid prejudice to the Tribes by tailoring the relief sought. Plaintiffs seek "nothing less than nullification of the Compact. If they succeed, the Tribe[s] will be deprived of the contractual benefits for which [they] bargained." Id. For the same reasons, I find that an adequate remedy cannot be rendered absent the Tribes, and therefore, the second and third factors favor dismissal of the case.

Finally, the fourth factor weighs against dismissal, as it is unclear whether plaintiffs may obtain an adequate remedy in an alternative forum. Nevertheless, "this result is a common

consequence of sovereign immunity, and the tribes' interest in maintaining their sovereign immunity outweighs the plaintiffs' interest in litigating their claims." American Greyhound, 305 F.3d at 1025. Thus, consideration of the relevant factors supports dismissal of this action.

Regardless, plaintiffs argue that the "public rights" exception to joinder applies in this case. "Under this exception, even if the [Tribes] are [a] necessary part[y], they are not deemed indispensable and, consequently, dismissal is not warranted." Kescoli, 101 F.3d at 1311. Plaintiffs must satisfy two requirements to invoke the public rights exception. Id. First, "the litigation must transcend the private interests of the litigants and seek to vindicate a public right." Id. Second, "although the litigation may adversely affect the absent parties' interests, the litigation must not 'destroy the legal entitlements of the absent parties.'" Id. (quoting Conner v. Burford, 848 F.2d 1441, 1459 (9th Cir. 1988)); see also Shermoen v. United States, 982 F.2d 1312, 1319 (9th Cir. 1992) ("Because of the threat to the absent tribes' legal entitlements, and indeed to their sovereignty, posed by the present litigation, application of the public rights exception to the joinder rules would be inappropriate.").

Plaintiffs rely on New Mexico ex rel. Clark v. Johnson, 904 P.2d 11 (N. Mex. 1995), where the plaintiffs sought a writ of mandamus on grounds that the governor was not authorized to enter

into tribal gaming compacts with several tribes. The New Mexico Supreme Court found that the tribes were not indispensable parties, because "[p]etitioners seek a writ of mandamus against the Governor of New Mexico, not against any of the tribal officials. Resolution of this case requires only that we evaluate the Governor's authority under New Mexico law to enter into the compacts and agreements absent legislative authorization or ratification." Id. at 19.[3] Similarly, plaintiffs here argue that their claims present "issues of constitutional and fundamental importance" with respect to separation of powers under the Oregon Constitution, because they, too, allege that the Governor was without authority to enter into the Compact. See id. at 18.

However, plaintiffs do not seek a writ of mandamus in this case; rather, they seek a declaration that the Tribes' Compact itself is unconstitutional and invalid. Therefore, unlike Clark, the Tribes' contractual rights under the Compact lie at the heart of plaintiffs' action. Further, Clark is distinguishable in that it evaluated the indispensability of the tribes under mandamus principles rather than Rule 19 or the public rights exception. Id. at 19. Finally, the Ninth Circuit found the analysis in Clark unpersuasive in American Greyhound. 305 F.3d at 1027.

---

[3]The Supreme Court of New Mexico subsequently held the tribes indispensable parties to litigation brought by state legislators and others challenging the legality of legislation authorizing Indian gaming in New Mexico. New Mexico ex rel. Coll v. Johnson, 990 P.2d 1277, 1280 (N. Mex. 1999).

There, the Ninth Circuit rejected the plaintiffs' arguments "that their action seeks only to ensure that the Governor acts in accordance with the state constitution and laws," reasoning that "[a]lmost any litigation, however, can be characterized as an attempt to make one party or another act in accordance with the law." American Greyhound, 305 F.3d at 1026. The court thus declined to apply the public rights exception, because it found that the plaintiffs' true "interest is in freeing themselves from the competition of Indian gaming, not in establishing for all the principle of separation of powers." Id.

Likewise, I find that any public right asserted by plaintiffs does not "transcend" their private interests. As evidenced by their affidavits, plaintiffs' interests in this case are parochial; plaintiffs are concerned with the effect the Tribes' casino will have on their taxes, property values, and other quality of life interests. Essentially, plaintiffs' claims "reflect their opposition to gaming and their interpretation of the statutes involved." Sears, 961 P.2d at 1020. Thus, plaintiffs' claims do not "implicate a matter of transcending importance of the type" that prompts application of the exception. Kickapoo Tribe of Indians v. Babbitt, 43 F.3d 1491, 1500 (D.C. Cir. 1995).

Even if plaintiffs were to meet the first requirement of the public rights exception, they fail to meet the second - that the Tribes' legal entitlements will not be "destroyed" by litigation in

their absence.  It goes without saying that the Tribes would lose
valuable contractual benefits if the Compact was held invalid.  As
the Ninth Circuit noted in <u>American Greyhound</u>:

> It is important in this case to retain perspective.  This
> litigation does not *incidentally* affect the gaming tribes
> in the course of enforcing some public right.  This
> litigation is *aimed* at the tribes and their gaming.  It
> was central to the plaintiffs' case to establish that
> casino-type gaming of the kind carried on under the
> existing compacts was unlawful under state law and IGRA.

305 F.3d at 1026 (emphasis in original).  Likewise, the Tribes'
gaming activities are not "incidental" to plaintiffs' claimed
vindication of a public right, because plaintiffs seek to
invalidate the Tribes' Compact.  Thus, the risk to the Tribes'
contractual interests precludes application of the public rights
exception.  <u>See</u> <u>Kescoli</u>, 101 F.3d at 1311-12 (public rights
exception inapplicable where rights of absent tribes' members under
lease agreements "could be significantly affected" if action
proceeded in tribes' absence).

Accordingly, I find that the Tribes are indispensable to this
action, and the case must be dismissed in their absence.

D.  <u>Compact's Compliance With IGRA and Oregon Law</u>

Finally, both parties move for summary judgment on the issue
of whether the Tribes' Compact violates Oregon law or IGRA.
Plaintiffs argue that the Tribes' Compact is unlawful under Oregon
law and IGRA for two reasons: 1) the Oregon Constitution prohibits
the establishment of "casinos"; and 2) the Governor had no

authority to enter into the Compact with the Tribes.

The State maintains that the Compact does not authorize any class III gaming that is prohibited by Oregon law, and therefore the Tribes are not precluded from engaging in gaming activities under the Compact, notwithstanding the Oregon Constitution's prohibition against casinos. Further, the State argues that both the Oregon Constitution and state statute authorize the Governor to negotiate and execute tribal-state gaming compacts.

<u>1. Validity of Class III Gaming Under the Compact</u>

As emphasized by State defendants, gaming on Indian lands is governed by federal rather than state law. Indeed, as <u>Cabazon</u> recognized, state law applies to Indians lands only if Congress has explicitly ceded such jurisdiction to the state. <u>Cabazon</u>, 480 U.S. at 207. Thus, Oregon law applies to the Tribes' gaming activities on the Hatch Tract only to the extent that IGRA or other federal law renders it applicable.

IGRA explicitly provides that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). As to class III gaming specifically, such gaming is lawful under IGRA if authorized by an approved Tribal ordinance or resolution, "located in a State that permits such gaming for any

purpose by any person, organization, or entity," and "conducted in conformance with a Tribal-State compact." Id. § 2710(d)(1)(A)-(C).

Here, the Tribes' gaming activities are authorized by an approved Tribal Ordinance and are conducted in conformance with the Compact. Thus, the sole issue is whether the class III gaming authorized under the Compact is permitted by the State of Oregon "for any purpose by any person, organization, or entity."

The Ninth Circuit has adopted the "game-specific" approach to this question, meaning that courts must determine whether applicable state law permits a specific type of game rather than a broad category of gaming. Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250, 1257-58 (9th Cir. 1994); Coeur d'Alene Tribe v. Idaho, 842 F. Supp. 1268, 1278 (D. Idaho 1994), aff'd, 51 F.3d 876 (9th Cir. 1995); see also Cheyenne River Sioux Tribe v. South Dakota, 3 F.3d 273, 278-79 (8th Cir. 1993). In other words, if the state entirely prohibits a particular game, the state is not required to negotiate with a tribe to permit that game, even if the state permits other games in the same classification. See Rumsey, 64 F.3d at 1258; Coeur d'Alene Tribe, 842 F. Supp. at 1279-80. Conversely, if the state allows a particular game for any purpose, it must negotiate with the tribe for that specific game. Id.[4]

_____

[4]Under the alternative "categorical" approach, courts review the general scope of gaming permitted by the state. See, e.g., Lac du Flambeau Band of Lake Superior Chippewa Indians v.

Plaintiffs do not identify a specific type of gaming activity authorized by the Compact but prohibited by Oregon law. In fact, Oregon law permits a wide range of gaming activities for various purposes. See Or. Rev. Stat. §§ 167.117(7)(b)-(d),(13) and 167.118 (authorizing charitable, religious and fraternal organizations to conduct "contests of chance," including bingo, lotto or raffle games, and "Monte Carlo" events such as blackjack, roulette, and craps); Or. Rev. Stat. § 167.121 (authorizing counties and cities to permit "social games" including poker or blackjack in places of public accommodation).

Instead, plaintiffs rely on Art. XV, § 4 of the Oregon Constitution, which provides that the "Legislative Assembly has no power to authorize, and shall prohibit, casinos from operation in the State of Oregon." Plaintiffs argue that the Oregon Constitution's prohibition against the establishment of "casinos" renders class III gaming authorized by the Compact unlawful. However, under IGRA and Rumsey, plaintiffs' argument is unavailing unless Art. XV, § 4 prohibits a specific gaming activity.

In Ecumenical Ministries of Oregon v. Oregon State Lottery Comm'n, 318 Or. 551, 871 P.2d 106 (1994), the Oregon Supreme Court

---

Wisconsin, 770 F. Supp. 480 (W.D. Wis. 1991). If the state permits any form of class III gaming, the tribe must be allowed to negotiate for all forms of class III gaming because the state is merely "regulate" rather than "prohibit" this category of gambling. Id. at 486-88; see also Mashantucket Pequot Tribe v. Connecticut, 913 F.2d 1024, 1031-32 (2d Cir. 1990).

addressed the scope of Art. V, sec. 4 and held:

> [I]n adopting Article XV, section 4(7), prohibiting the operation of "casinos," the voters intended to prohibit the operation of establishments whose dominant use or dominant purpose, or both, is for gambling. The voters did not intend, in adopting Article XV, section 4(7), to prohibit the use of lottery games using computer terminals, with the exception of those that dispense coins or currency directly to players.

Id. at 562, 871 P.2d 106. Thus, although the Oregon Constitution prohibits gambling establishments, it does not prohibit a specific gaming activity.

Nevertheless, plaintiffs argue that all class III gaming conducted in a casino is prohibited by the Oregon Constitution and that, under Rumsey, the Tribes should receive no greater rights to conduct gaming than those received by the general public. In other words, while the Tribes may conduct any of the class III gaming activities authorized by the Compact, plaintiffs contend they may not do so in a casino, because the setting or "method" renders the nature of the gaming qualitatively different. Plaintiffs misapprehend IGRA's application and the reach of state law over tribal gaming conducted pursuant to compact.

It is well-established that IGRA, as a matter of federal law, preempts state regulation which "interferes or is incompatible with federal or tribal interests." Confederated Tribes of Siletz Indians v. Oregon, 143 F.3d 481, 487 (9th Cir. 1998) (citation and quotation marks omitted). While it is true that "a state need only allow Indian Tribes to operate games that others can operate,"

<u>Rumsey</u>, 64 F.3d at 1258, "Congress intended to permit a particular gaming activity, *even if conducted in a manner inconsistent with state law*, if the state law merely regulated, as opposed to completely barred, that particular gaming activity." <u>Northern Arapaho Tribe v. Wyoming</u>, 389 F.3d 1308, 1312 (10th Cir. 2004) (citing <u>United States v. Sisseton-Wahpeton Sioux Tribe</u>, 897 F.2d 358, 365 (8th Cir. 1990)) (emphasis in original). Nowhere in the <u>Rumsey</u> decision does the Ninth Circuit suggest that the "method" of the gaming matters in determining whether a particular class III game is permitted by state law.

Consequently, if a state permits gaming activity "for any purpose by any person," IGRA authorizes such gaming activity on Indian lands without the restrictions imposed by state law on off-reservation gaming. 25 U.S.C. § 2710(d)(1); <u>see also</u> <u>Mashantucket Pequot Tribe</u>, 913 F.2d at 1030-31 (if tribes must conduct class III gaming "only in accordance with, and by acceptance of, the entire state corpus of laws and regulations governing such gaming . . . [t]he compact process that Congress established as the centerpiece of the IGRA's regulation of class III gaming would thus become a dead letter"). For example, a state is required to negotiate a compact for class III gaming if the state permits casino-type gaming activities for social, non-profit, or charitable purposes, even if casino-style gaming is prohibited for commercial purposes. <u>Mashantucket Pequot Tribe</u>, 913 F.2d at

1031.  As applied to this case, because Oregon allows various persons and organization to conduct class III games for various purposes, the State must negotiate with tribes to permit those games on Indian lands free from state restrictions – such as the prohibition against casinos – that would otherwise apply.  Where class III gaming takes place is simply irrelevant to the inquiry under IGRA.

Indeed, in every case addressing this issue, courts have uniformly rejected the argument that gaming on Indian lands pursuant to a tribal-state compact is subject to the same laws and regulations that apply to gaming on non-Indian lands.  See Northern Arapaho Tribe, 389 F.3d at 1311-12 ; Mashantacuket Pequot Tribe, 913 F.2d at 1031-32; Ysleta del Sur Peublo v. Texas, 852 F. Supp. 587, 593-95 (W.D. Tex. 1993) rev'd on other grounds, 36 F.3d 1325 (5th Cir. 1994); Willis, 850 F. Supp. at 531-32; Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin, 770 F. Supp. 480, 488 (W.D. Wis 1991); Dalton v. Pataki, 835 N.E.2d 1180 (N.Y. 2005).

An argument similar to plaintiffs was raised recently in Dalton v. Pataki, 835 N.E.2d 1180 (N.Y. 2005).  There, the New York Court of Appeals addressed the issue of whether the state could allow the governor to enter into tribal-state gaming compacts when the state constitution prohibited commercial gambling generally.  Id. at 1186.  The court rejected the plaintiffs' argument that the

state constitution prohibition against commercial gaming rendered class III gaming on Indian lands unlawful, finding that "IGRA does not allow the state to consider the purpose behind the gaming." Id. at 1189. Noting that the statutory language makes clear that class III gaming is permitted on Indian lands "when located in a state that permits such gaming for *any* purpose by *any* person," the court held that "since New York allows some forms of class III gaming - for charitable purposes - such gaming may lawfully be conducted on Indian lands provided it is authorized by tribal ordinance and is carried out pursuant to a tribal-state compact." Id. Likewise, because Oregon permits class III gaming in various circumstances, such gaming is permitted on the Hatch Tract.

None of the cases cited by plaintiffs hold to the contrary. For example, plaintiffs rely on Hotel Employees and Restaurant Employees Int'l Union v. Davis, 981 P.2d 990 (Cal. 1999), where the plaintiffs challenged Proposition 5, a voter initiative allowing class III gaming in tribal gaming facilities. Id. at 994. The plaintiffs claimed that Proposition 5 violated several California statutes prohibiting certain types of gaming as well as art. IV, § 19(e) of the California Constitution, which provided: "The Legislature has no power to authorize . . . casinos of the type currently operating in Nevada and New Jersey." Id. at 997-98. The California Supreme Court held that the language of art. IV, § 19(e) "may be understood, with reasonable specificity, as one or more

buildings, rooms, or facilities, whether separate or connected, that offer gambling activities including those statutorily prohibited in California, especially banked table games and slot machines." Id. at 1004. In other words, the Court found that art. IV, § 19(e) "was designed, precisely, to elevate statutory prohibitions on a set of gambling activities to a constitutional level." Id. at 1005. Accordingly, the California Supreme Court ruled that Proposition 5 was invalid because it sought to legalize gaming that was otherwise statutorily and constitutionally prohibited. See id. at 1009; cf. Artichoke Joe's v. Norton, 216 F. Supp. 2d 1083, 1095-96 (E.D. Cal. 2002) (noting that California law prohibited class III games under Cal. Const. art. IV, § 19(e), and Cal. Penal Code §§ 330, 330a, 330b).

In contrast to Hotel Employees, plaintiffs identify no Oregon provision that prohibits the class III games authorized under the Tribes' Compact. Rather, as cited above, Oregon law permits charitable, religious and fraternal organizations to raise funds through "contests of chance," including bingo, lotto or raffle games, or "Monte Carlo" events such as blackjack, roulette, craps, and other casino-style games. Or. Rev. Stat. §§ 167.117(7)(b)- (d),(13), 167.118. Oregon law further permits counties and cities to authorize the playing of "social games" in places of public accommodation, including poker or blackjack, if all participants play and bet against each other rather than the "house." Or. Rev.

Stat. § 167.121.  Oregon also allows the operation of video lottery terminals and on- and off-track pari-mutuel betting on horse and greyhound races.  Or. Rev. Stat. §§ 462.010(8),(12), 462.020(1), 462.700-740.

Plaintiff's reliance on <u>Hotel Employees</u> and other cited cases is thus misplaced.  <u>See</u> <u>United States v. Santee Sioux Tribe</u>, 135 F.3d 558, 564-65 (8th Cir. 1998) (granting injunction in case brought by United States to enjoin tribal gaming prohibited by state law and conducted without a tribal-state gaming compact); <u>Cheyenne River Sioux Tribe</u>, 3 F.3d at 278-79 (finding that tribes were not allowed to engage in specific casino-style games prohibited by state law); <u>Citizen Band Potawatomi Indian Tribe v. Green</u>, 995 F.2d 179, 181 (10th Cir. 1993) (finding importation of video lottery terminal unlawful because Oklahoma state law prohibited gambling devices).

Finally, plaintiffs argue that section 23 of IGRA, codified at 18 U.S.C. § 1166, renders all state laws applicable to tribal gaming on Indian lands, including the prohibition against casinos. Section 1166 provides that "for purposes of Federal law, all State laws pertaining to the licensing, regulation or prohibition of gambling . . . shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." However, reliance on § 1166 is unavailing.  Exempted from the definition of "gambling" are any gaming activities conducted

pursuant to an approved compact between the tribes and the state. Id. § 1166(c)(2). Consequently, § 1166 applies only to non-compacted gaming, and Oregon laws regulating the time, manner and place of gaming activities do not apply to class III gaming conducted under the Tribes' Compact.

Accordingly, I find that the Tribes' Compact does not violate Oregon law or IGRA, because class III gaming under the Tribes' Compact is "located in a State that permits such gaming for any purpose by any person, organization or entity."

## 2. Governor's Authority to Enter Into Compact

Finally, State defendants and plaintiffs move for summary judgment on the issue of whether the Governor is authorized under Oregon law to negotiate gaming compacts with Indian tribes.[5]

Plaintiffs argue that neither the Oregon Constitution nor Oregon statute delegate the authority to execute gaming compacts with Indian tribes, and thus the Governor is without the power to do so without legislative approval. Therefore, plaintiffs argue that the Tribes' Compact was not "lawfully" executed under IGRA.

---

[5]Plaintiffs moved for certification of this question to the Oregon Supreme Court. However, shortly after their motion for certification was filed, plaintiffs and defendants moved for summary judgment. "The certification procedure is reserved for state law questions that present significant issues, including those with important public policy ramifications, and that have not yet been resolved by the state courts." Kremen v. Cohen, 325 F.3d 1035, 1037 (9th Cir. 2003). Even if the court found that certification of this question was appropriate, I decline to do so given plaintiffs' lack of standing and the Tribes' sovereign immunity and indispensability as a party.

The State maintains that the Governor possesses constitutional authority to enter into compact with tribes, because the Oregon Constitution provides that the Governor "shall transact all necessary business with the officers of government." Or. Const. Art. V, § 13. Because IGRA is binding federal law and the State must negotiate a compact in good faith upon request by an Indian tribe, the State argues that negotiating and executing a tribal gaming compact is "necessary business" that the Governor is duty-bound to transact with tribal officials. 25 U.S.C. § 2710(d)(1)(B).

For the reasons cited by the State, I agree that the execution of gaming contracts is "necessary business" to support the Governor's authority to do so under Art. V, § 13 of the Oregon Constitution. See Willis, 850 F. Supp. at 532 (statute stating that "the governor shall transact all the business of the state, civil and military, with the United States Government or with any other state or territory, except in cases otherwise specially provided by law" authorized the governor to negotiate tribal-state compact); but see State ex rel. Stephen v. Finney, 836 P.2d 1169, 1178 (Kan. 1991) (finding that the "transaction of business connotes the day-to-day operation of government under previously established law or public policy"). However, even if the Oregon Constitution does not confer such authority, I find it granted pursuant to state statute.

State defendants rely on Or. Rev. Stat. § 190.110, which

provides:

> (1) In performing a duty imposed upon it, in exercising
> a power conferred upon it or in administering a policy or
> program delegated to it, a unit of local government or a
> state agency of this state may cooperate for any lawful
> purpose, by agreement or otherwise, with a unit of local
> government or a state agency of this or another state, or
> with the United States, or with a United States
> governmental agency, or with an American Indian tribe or
> an agency of an American Indian tribe. . . .

> (2) The power conferred by subsection (1) of this section
> to enter into an agreement with an American Indian tribe
> or an agency of an American Indian tribe extends to any
> unit of local government or state agency that is not
> otherwise expressly authorized to enter into an agreement
> with an American Indian tribe or an agency of an American
> Indian tribe.

> (3) With regard to an American Indian tribe, the power
> described in subsections (1) and (2) of this section
> includes the power of the Governor or the designee of the
> Governor to enter into agreements to ensure that the
> state, a state agency or unit of local government does
> not interfere with or infringe on the exercise of any
> right or privilege of an American Indian tribe or members
> of a tribe held or granted under any federal treaty,
> executive order, agreement, statute, policy or any other
> authority. . . .

The State maintains that 190.110(3) authorizes the Governor
to negotiate and execute tribal-gaming compacts to ensure that
state or local governments do not interfere with Indian tribes'
rights to conduct gaming under IGRA. Plaintiffs respond that the
State cannot rely on this provision, because it only confers
authority to enter agreements when "performing a duty imposed,"
"exercising a power conferred," or "administering a policy or
program delegated." Id. § 190.110(1). Plaintiffs argue that
entering into a compact is not in furtherance of a conferred power,

a imposed duty, or delegated program but rather a creation of law and policy. I disagree.

The plain language of § 190.110(3) provides that the authority of the Governor set forth in subsections (1) and (2) "includes" the Governor's authority to "enter into agreements" with Indian tribes. Further, as emphasized by the State, IGRA specifically provides that tribes have the authority to conduct gaming activities unless prohibited by state law, and that upon request by a tribe, the state must in good faith negotiate for such gaming activities. I thus agree with the State that the negotiation and execution of gaming compacts ensure that state and local governments do not interfere with tribal gaming rights protected by federal law.

The State's interpretation of § 190.110(3) is bolstered by an opinion rendered by the Oregon Attorney General in 1990, finding that § 190.110 authorizes the Governor to negotiate tribal-state gaming compacts with Indian tribes:

> Both by its terms and in light of its legislative history, ORS 190.110 directly applies here. In sum, as head of the executive branch, the Governor may negotiate a tribal-state compact under the IGRA, or delegate that responsibility to any officer or officers within the executive branch.

Or. Op. Att'y Gen. OP-6300, 1990 WL 519220, *13 (Sept 26, 1990). In the fifteen years since this opinion was rendered, no court has held to the contrary, and Indian tribes and the States have relied upon § 190.110 when negotiating compacts.

Finally, I find persuasive legislative history reflecting the

legislature's intent to provide a mechanism by which the State and tribes may negotiate and enter into binding agreements without legislative approval. See Or. Rev. Stat. § 174.020 (authorizing review of legislative history when construing a statute to discern legislative intent). When § 190.110 was proposed as Senate Bill 159 during the 1985 legislative session, testimony was presented that the purpose of the statute was to authorize the Governor to execute binding agreements with tribes, so that the State could not repudiate an agreement at a later date. Hearing on S.B. 159, Senate Government Operations and Elections Committee (April 1, 1985).[6] Included in the testimony was an example of Indian tribes' right to engage in gaming activities free from state regulation and the Governor's ability to address concerns arising from such activities if Senate Bill 159 were to become law. Id.

Since the enactment of § 190.110 and the Attorney General's 1990 opinion, the Oregon legislature has considered and rejected amendments that would implement a legislative role in the negotiation and execution of state-tribal compacts. In 1997, Senate Bill 881 was proposed, which would have required the Governor to consult with the legislature before and during negotiations with Indian tribes and to submit proposed compacts to

---

[6]State defendants cite SB 159 and its legislative history in their Memorandum of Law in Support of Motion for Summary Judgment, pp. 39-41. Plaintiffs do not question the accuracy of this legislative history, and I therefore accept it.

the legislature or legislative officers for review.  1997 OR S.B. 881 (SN).[7]  After testimony that such amendments would create an undue burden on tribes and the State, no further action on Senate Bill 881 was taken.  Hearings on S.B. 881, Senate Committee on Trade and Economic Development (March 25 and April 3, 1997).

Further, in 2001, a joint resolution was proposed that would have referred a constitutional amendment to the voters to require legislative approval of proposed tribal-state gaming compacts. 2001 S.J.R. 29 (2001).  After referral to the Senate Committee on Business, Labor, and Economic Development, no further action was taken on the resolution.  Id.  This legislative history establishes the legislature's intent to authorize the Governor to enter into agreements with Indian tribes without legislative approval, and that such authority encompasses the execution of gaming compacts.

In light of the statutory language, the opinion of the Attorney General, and relevant legislative history, I find that § 190.110 authorizes the Governor of Oregon to negotiate and execute state-tribal gaming compacts, and that the Tribes' Compact with the State was lawfully executed.

///

///

---

[7]Again, the state defendants quote SB 881 and its relevant legislative history in their Response to Plaintiffs' Motion for Summary Judgment, pp. 27-29 and n. 10.  Plaintiffs do not question the accuracy of these quotes and they are accepted.

CONCLUSION

As with their previous challenges to the Tribes' right to conduct class III gaming under the Compact, the claims alleged in this action, too, must fail. Plaintiffs allege generalized grievances against tribal gaming that fail to confer standing and are better left to the legislative process. Further, the Tribes are an indispensable party to this action, and they have not waived their sovereign immunity or consented to suit. Pursuant to IGRA's authorization of class III gaming activities on Indian lands if conducted in a state that permits such gaming, the Tribes' Compact lawfully authorizes class III gaming on the Hatch Tract. Finally, under the Oregon Constitution and Or. Rev. Stat. § 190.110, the Governor possesses the authority to enter into tribal-state gaming compacts, and the Tribes' Compact was lawfully executed.

Accordingly, the State defendants' and the Tribes' Motions for Summary Judgment (docs. 57, 61) are GRANTED, and plaintiffs' Motion for Order to Certify Questions and for Summary Judgment (docs. 46, 77) are DENIED. This case is DISMISSED.

IT IS SO ORDERED.

DATED this ___21___ day of December, 2005.


_____/s/ Ann Aiken_____
Ann Aiken
United States District Judge


45 - OPINION AND ORDER